Bernard S. Meyer, J.
Involved in this divorce action is the question under what circumstances does the mental condition of an erring spouse constitute a defense. Though New York defines by statute the standard governing responsibility for criminal conduct (Penal Law, § 1120) and establishes a wholly different measure for determining when a mentally ill person may be hospitalized (Mental Hygiene Law, § 2, subd. 8), it has enacted no statute fixing criteria for responsibility for conduct in violation of marital obligations. New York case law has recognized that an insane wife is incapable of abandoning her husband (Goodale v. Lawrence, 88 N. Y. 513, 520) and refused a divorce to a husband whose wife committed adultery while suffering from dementia prsecox (Laudo v. Laudo, 188 App Div. 699; see, also, Horn v. Horn, 142 App. Div. 848; Rathbun v. Rathbun, 40 How. Prac. 328, 330). Some of those cases emphasize the marital obligation to provide support, including medical *774 assistance, to an afflicted spouse; in none was it necessary to consider the degree of affliction that would excuse infidelity.
Should the standard be that advanced in M’Naghten’s Case (10 Cl. & F. 200) and now embodied in the Penal Law (§ 1120): ability to distinguish right from wrong or to understand the nature and quality of the act? The Laudo court (supra) had no need specifically to answer the question, for, on the facts it found, the criminal standard was met. In Pennsylvania (Manley v. Manley, 193 Pa. Super. 252, 264) and some other States (Annotation: 19 A. L. R. 2d 144, 147, 174) this is the standard used in matrimonial as well as criminal cases. Or should the criteria of responsibility be that suggested as a revision of the criminal rule in Durham v. United States (214 F. 2d 862 [C. A., D. C.]) and expanded upon in Carter v. United States (252 F. 2d 608 [C. A., D. C.]), under which the defense is established by showing (a) a mental disease or defect, and (b) that the act in question was the product or result of the disease or defect; that is — that the defendant would not have committed the act if he had not been diseased as he was (cf. People v. Schmidt, 216 N. Y. 324, 340). Few Jersey’s test of ability to exercise a rational judgment at the time the adultery was committed (Kretz v. Kretz, 73 N. J. Eq. 246); Huster v. Huster, 64 N. J. Super. 29, 38) appears to fit in the latter category, and the statement in the Laudo case (supra) that penalty should not be imposed ‘ ‘ upon one who is a victim of conditions beyond her control, and not a willing, rational actor ” (p. 704; emphasis supplied) suggests the Durham-Carter rule. While at first blush the conclusion of the American Bar Foundation’s study of “ The Mentally Disabled and the Law ” appears contrary to use of Durham-Carter standards in matrimonial cases, its suggestion (p. 203) that “ serious thought should be given to the use [in divorce cases] of standards defining civil hospitalization ”, of necessity refers only to the presence of a mental disease or defect and is not understood as excluding causal relationship in matrimonial cases, although causal connection has no bearing on civil hospitalization.
Perhaps the fairest manner to resolve the conflict between the obligation of support on one side and the obligation of fidelity on the other is by legislation similar to the Domestic Relations Law (§ 7, subd, 5) in which criteria of responsibility will be spelled out and dissolution of the marriage allowed in less than five years when the mental illness afflicting a spouse involves sexual promiscuity. In the present case, however, it is not necessary for the court to choose between the possible stand *775 ards, for whichever is applied, the court’s conclusion is that plaintiff is entitled to judgment of divorce.
The burden of proving mental condition relieving defendant of responsibility is on defendant (Laudo v. Laudo, 188 App. Div. 699, 706, supra; see, also, Matter of Jacobs, 2 A D 2d 774, affd. 3 N Y 2d 723). Her sanity is presumed and the presumption must be overcome by a contrary showing (Matter of Jacobs, supra). To overcome the presumption defendant offered the testimony of her psychiatrist and the record of her hospitalization at Meadowbrook a few days after the incident which is the basis of this action. The psychiatrist testified that defendant had been under his care since September, 1960; that she was even now highly unstable; that he had first diagnosed her as a character disorder, but later concluded that she was schizophrenic-affective type; that when hospitalized at Meadowbrook she was quite irrational and talking of destroying herself, but that he felt that committing her to Pilgrim State would destroy her ability for re-integration and, therefore, took her back as a private case; that in his opinion it was best for her to be working and that she, therefore, has been attending speedwriting classes since shortly after she left Meadowbrook Hospital; that after the incident he had asked her indirectly if she had committed adultery since and she had evaded the question; that prior to the incident she was aware that she was being followed since plaintiff had told her in the presence of the psychiatrist that as a result of prior infidelities he intended to have her followed; that defendant had discussed the rendezvous with the witness three days before it occurred and told him that she had sought to dissuade her paramour from going through with it and had told the paramour that he might be involved in a lawsuit ; that defendant nonetheless felt compelled to go ahead with the meeting; that she was motivated by emotionality rather than rational thinking and felt justified in what she was going to do; that she was unable to determine that it was a wrong act; that it was for her primarily a means of getting even with her father, and to a lesser degree with plaintiff, both of whom considered her a ‘ ‘ bad ’ ’ person; that in his opinion she was unable to control her actions and in poor contact with reality at the time of the incident, and was then unable to distinguish the true nature of the act she was committing or to differentiate right from wrong; that although she knew vaguely that what she was doing was contrary to law and social conventions, she was not aware of the legal or social consequences; that when she had sufficient health, she would not engage in extra-marital relations *776 and because she got as far into the act as plaintiff’s proof of the incident showed, he concluded that she was no longer capable of making a decision concerning it. The hospital record shows an initial impression of schizophrenic reaction, affective type, chronic, severe, but this was changed a few days later to character disorder. There is a notation that ‘ ‘ she is quite aggressive sexually” and the nurse’s notes of January 28, 1962 detail incidents in the ward which, apparently, form the basis for that conclusion, including overtures of a homosexual nature.
On the other side of the scale is the testimony of plaintiff’s psychiatrist that in his opinion while defendant has had phychiatric difficulty and was emotionally unstable and in need of treatment, she was sufficiently intact to be able to use the ordinary standards of right and wrong; that she behaved in a manner which indicated that she was aware of those factors; that she knew at the time of the incident that she was committing adultery and that it was wrong; that she is not schizophrenic and that her stating to him that she had no recollection of the incident but being able quickly and accurately to supply data unrelated to the incident indicated to him that she was lying in an attempt to evade discussion of the incident with him. Also to be weighed are (1) the testimony of two investigators, members of the raiding party, that when they broke into the hotel room defendant jumped up from bed, cried out “ Oh no ” repeatedly and ran toward the bathroom, (2) the photograph of defendant standing completely nude near the bathroom door, her face covered by a towel, (3) defendant’s affidavit of February 26, 1962, which recounts in detail and with coherence her problems with her parents and with plaintiff and plaintiff’s finances, and among other things states that as a result of an hysterectomy ‘ ‘ I felt the need for proving myself as a woman. I had to be assured that I was still wanted as a woman,” (4) defendant’s failure, though present in the courthouse, to testify or even to enter the courtroom where the trial was being held.
The court concludes that defendant has not sustained the burden of proof. Had she testified the impressions gained by the court during her testimony would have supported the opinion of one or the other of the psychiatrists. At the base of the differing opinions of the experts is their differing views of her credibility. Her credibility is also the central issue in this case. Deprived of the opportunity of forming first-hand impressions concerning defendant’s credibility, the court can choose between the experts’ views only on the basis of the consistency of those views with the evidence as a whole. The inconsistency between
*777 the conclusion that defendant was driven into acts of adultery by an irrational necessity to get even with her father and with plaintiff and, on the one hand, the homosexual overtures at the hospital, and, on the other, the implication in defendant’s affidavit that the acts of adultery resulted from the necessity of proving herself a woman, suggests to the court that the hospital overtures and the affidavit’s contention are afterthoughts contrived by defendant to escape the consequences of her act. That defendant went ahead with her tryst notwithstanding she had been warned she was being followed can be interpreted as irrational but might also indicate either disbelief that plaintiff would take action or a rational conclusion on her part that her relationship with plaintiff had so far deteriorated that she did not care whether the marriage continued or not. While her statement to her psychiatrist that she tried to talk the paramour out of going ahead with their plans is consistent with irrationality, her actions when caught and thereafter, as demonstrated by word and deed, suggest a realization of the nature of her conduct and a desire to avoid its consequences. On all of the evidence the court concludes that defendant has not demonstrated by a preponderance of the credible evidence that she was, as pleaded in her separate defense, “ suffering from mental and emotional disorders so as to make her incompetent and irresponsible for the acts charged against her in the complaint.”
Plaintiff is, therefore, awarded judgment of divorce. Defendant has not sought custody of the children. The judgment will award custody to plaintiff and provide for visitation by defendant on the same basis as now provided in the temporary order. Defendant’s request for additional counsel fee has, the court is informed, been amicably adjusted. Her motion for increase of her temporary alimony is denied.